IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| DAN BERREY, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 110191D |
| | ) | |
| v. | ) | |
| | ) | |
| LANE COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the real market value of property identified as Account 1724408 (subject property) for tax year 2010-11. A trial was held in the Oregon Tax Court Mediation Center with Plaintiff appearing in person and Defendant appearing by telephone on October 17, 2011. Plaintiff, an Oregon real estate broker, testified on his own behalf. David Sohm (Sohm), Registered Appraiser 3, Lane County Assessment and Taxation, appeared on behalf of Defendant.

Defendant's Exhibit A was accepted after discussion of the court's exhibit exchange rule.[1]

## I. STATEMENT OF FACTS

Sohm described the subject property as a land parcel measuring 25,133 square feet and a partially completed building. (Def's Ex A at 2, 3.) Plaintiff testified that he purchased the land in 2004, paying $450,000. He testified that the "property suffers" from (a) "restricted access," (b) "in-line sight" because it is not a "corner lot with better exposure," and (c) "shared parking" with the neighboring retail business, Dollar Tree.

/ / /

---

[1] Although Defendant's Exhibit A was labeled as Plaintiff's Exhibit 1, Defendant's cover letter identified the exhibit as Defendant's Exhibit A. In its decision, the court will refer to Defendant's exhibit as Def's Ex A.

DECISION  TC-MD 110191D                                                                                    1

Plaintiff testified that the building's "net rentable area" is 3,040 square feet, not 3,121 square feet as measured by Sohm. (*Id.* at 3.) He testified that the building has been "vacant" from "March 2006" through the date of assessment, January 1, 2010. Plaintiff testified that he "marketed" the building at "$20 to $34 per square foot, triple net" and "no tenant leased the building." He testified that even though he no longer owns the building, he is the leasing agent and a "letter of intent" was recently signed with a tenant for "$18 per square foot, triple net." In response to questions, Plaintiff testified that the rent per square foot was reduced from the asking "rent of $34 per square foot in 2006 and 2007" to the "lower rate of $20 per square foot" when no one leased the building.

Plaintiff testified that he is requesting a real market value of $410,000 as of January 1, 2010. He testified that an appraisal of the subject property in August 2010 determined a real market value of $540,000. Plaintiff testified and Sohm acknowledged that a copy of that appraisal had been given to Sohm but was not offered as an exhibit. Plaintiff testified that the subject property was "foreclosed" in June 2010 and subsequently sold to a limited partnership and he is not one of the partners/owners. Even though Plaintiff testified that the August 2010 sale was an "arm's-length transaction," Sohm concluded that the sale "is a foreclosure sale 19 months after the date of value and does not reflect the highest and best use of the property." (Def's Ex 1at 1.)

Sohm testified that the subject property's highest and best use "[d]ue to the location and size, the physically possible legally permitted use of the vacant site that would produce the highest value as of January 1, 2010 is estimated to be for a commercial development" as a "fast food restaurant." (*See id.* at 4.) Sohm concluded in his Commercial Appeal Summary of Salient

/ / /

Facts (Summary) "that all three approaches [to value: cost, sales comparison, and income] can be reliably applied to the subject property." (*Id*. at 6.)

Using the cost approach, Sohm "valu[ed] the subject 25,133 square foot site * * * by direct sales comparison analysis," relying on four sales of land "zoned for similar uses and of adequate size to support a fast food restaurant." (*Id*. at 7, 8.) Sohm's Summary stated that the four land sales occurred in November 2006, April 2008, January 2009, and April 2009 and ranged in size from 19,720 square feet to 95,857 square feet. (*Id*. at 7.) Sohm testified that the price per square foot ranged from $27.52 to $34.67, and he concluded that "a price of $28 per square foot is selected for the subject property." (*See id*. at 8.) Sohm added "$1 per square foot" for site preparation cost. (*Id*.) Sohm's determination of the subject property's land real market value as of the assessment date was $729,000 (rounded). (*Id*.) Sohm acknowledged that each of the land sales "is a corner parcel." Plaintiff questioned Sohm's "trend adjustment" for the 2006 land sale, stating that the "assessor increased the subject property's land real market value 63 percent from 2004 to 2010" but only "time trended" the 2006 land sale price "one-half of one percent per month." Sohm responded stating that the county experienced "substantial appreciation" in land values from 2004 to 2006. Sohm testified that his adjustments were "qualitative" because there was not "enough data to make quantitative adjustments." Plaintiff testified that the subject property's land value is "grossly overvalued."

Sohm's Summary stated that the "building and site improvement costs were developed using the Marshall Valuation Service." (*Id*.) Sohm concluded a "base cost factor at January 1, 2010 of $103.13 and added a "[d]eveloper's overhead and profit * * * [of] 5 percent of total project direct and indirect costs." (*Id*. at 9.) He testified that three adjustments were required: physical depreciation ("3% based on a 30 year expected life"), external obsolescence

("approximately 25%," measuring the impact of the recession) and cost to build out the property that "was not completed at the date of value." (*Id*. at 9, 10.) Sohm testified that using the cost approach he determined a real market value of $919,000 (rounded). (*See id*. at 10.)

Sohm testified that in using the sales comparison approach that "[s]everal sales of fast food properties in the local market have been researched" and four sales were determined to be comparable to the subject property. (*See id*. at 11.) Sohm testified that those identified comparable properties ranged in sale price from $340,000 to $1,300,000 and the sale dates ranged from January 2008 to November 2010. (*Id*. at 15.) He testified that the properties were wood frame or concrete block and were built from 1964 to 2005. (*See id*.) For the two properties that he concluded were most comparable to the subject property, Sohm testified that Sale 1 "was not a franchise" property and was "located on an interior lot that was smaller than the subject" and Sale 3 "was located on a corner site in Junction City, a city that was hit hard by loss of motor coach manufacturing jobs." Sohm testified that he concluded "[b]ased on the above qualitative comparisons" that "the subject property would command a price per square foot between the indication of Sale 3 at $354 and Sale 1 at $387. * *  * Overall, a price per square foot of $354 is selected for use in this analysis[,]"* * * resulting "in a value indication of $1,104,834." (*See id*.) Because "the building is not yet complete," Sohm adjusted the value indication for the costs to complete, computing "an as is value of  * * * $921,000." (rounded). (*Id*. at 16)

In describing the income approach, Sohm wrote in his Summary that "[t]he income approach relies on the principle of anticipation, which holds that value is created based on an expectation of future benefits" at stabilized occupancy. (*Id*.) He testified that he relied on "direct capitalization * * * to value the subject property." (*See id*.) Sohm testified that he

selected four "lease comparables" to determine rent per square foot. (*See id*.) He concluded that "Lease 3,* * * a property quite similar to the subject that is not a major franchise operation and is located 1,100 feet west of the subject property on an interior lot[,] * * * is considered the most comparable to the subject property, but is somewhat smaller building. The lease rate applicable to the completed subject fast food restaurant is estimated to be $2.75 per square foot, or $8,583 per month triple net. The estimated annual potential gross income is $102,996. (*Id*. at 16, 17.) In response to questions, Sohm testified that he did not know the date each lease was signed or commenced.

> In discussing vacancy and collection loss, Sohm testified that the subject property
>
> "has been exposed to the market, and remains vacant. * * * The subject building was constructed on a speculative basis. As occupied the property would expect to have a reasonably low vacancy rate. For the value as completed and occupied the estimated vacancy and credit loss factor would be five percent. The allocation for vacancy and credit loss is $5,150, resulting in effective gross income of $97,846."

(*See id*. at 17) Plaintiff challenged Sohm's comparison of the subject property – a vacant property -- to "McDonald's and KFC."

Sohm testified that because the subject property would lease under "triple net," the operating expenses "would involve minimal management and reserves for replacement." He concluded that "[a]n allocation of three percent of effective gross income is judged to be appropriate for management, resulting in an expense of $8,837 per year" and "[a]n allocation of two percent is appropriate to reserves for replacement of short lived items in this new building, amounting to $5,891 per year. Total expenses are estimated to be $14,728." (*Id*. at 18.) Sohm testified that he determined a "projected net operating income before property taxes for the subject property" of "$83,118." (*See id*.)

/ / /

To determine a capitalization rate, Sohm testified that he "looked to the comparable sales" presented in his Sales Comparison Approach. (*See id*. at 15.) The capitalization rates ranged from "5.87% to 13.48%." (*Id*. at 18.) Because Comparable #3 was "an older building with a very high lease rate, which motivated the tenant to buy the building and reduce the cost of occupancy," Sohm eliminated Comparable #3, lowering "the upper end of the range to 6.99%." (*Id*.) Sohm testified that "[a]s completed the subject property would command an overall capitalization rate similar to Sale 1." (*See id.*) He testified that "[b]ecause the subject building is not yet finished, a rate ½ percent higher than Sale 1 at 7.5% is selected for use in this analysis, even though it is applied to income on a stabilized basis." (*See id*.)

Sohm's Summary stated:

> "Applying the overall capitalization rate to the net income requires dividing the income by the overall capitalization rate. The calculation * * * indicates a value of $1,108,240. Deducting the cost to complete the building as estimated on page 9 at $184,289 results in a net as is value of $923,951, which is rounded to $924,000."

(*Id*.) Plaintiff asked Sohm how he determined the cost to complete the building; he responded that he relied on the costs to complete a comparable property.

In reconciling the indicated values by the three approaches, Sohm concluded that "[b]ased on the data and analysis the sales comparison and income approaches are given roughly equal weight in concluding a real market value as of January 1, 2010 of $921,000." (*Id*. at 19.)

## II. ANALYSIS

The issue before the court is the 2010-11 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. *See Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL

/ / /

/ / /

21263620, at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[2] which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); ORS 308.205(2) and OAR 150-308.205-(A)(2). Plaintiff did not present evidence using any of the three approaches.

This court has previously concluded that real market value "assumes an active or 'immediate' market by which value can be inferred from a number of transactions." *Watkins v. Dept. of Rev.*, 14 OTR 227, 229 (1997). The *Watkins* opinion continued, stating that "[r]arely is there a market for partially completed structures." *Id.* The court suggested that "statewide" data can be collected and compiled into cost factors that can be adjusted by the county assessor for local conditions. *Id.* Those factors can then be used to estimate the total cost of an improvement in a given location. Another equally satisfactory method is for the assessor to total the cost of the work completed as of the assessment date. *Id.* at 230.

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's land real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530 at 4 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)).

---

[2] References to the Oregon Revised Statutes are to year 2009.

Plaintiff must present the greater weight of evidence to support his requested real market value reduction. This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted). Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers. Plaintiff failed to use any of the three common approaches prescribed by statute to determine the real market value of the subject property. Plaintiff did not provide the court with any evidence other than his testimony. He referenced and relied on a determination of real market value by an appraiser that is substantially more than Plaintiff's requested real market value. Plaintiff's testimony does not support his requested reduction in real market value and absent the appraiser's testimony the court cannot properly determine the weight, if any, to give to that appraiser's determination of the subject property's real market value.

Plaintiff's evidence in support of his requested real market value reduction is inconclusive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof ***." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). Plaintiff has failed to carry his burden of proof.

Even though the burden has not shifted, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence pleaded by the parties." ORS 305.427. Sohm testified and submitted a document entitled "Commercial Appeal Summary of Salient Facts." (Def's Ex A.) In his Summary, Sohm concluded that the subject property's land real market value to be $729,000. (*Id*. at 8.) In making that determination, Sohm researched

"sales of comparably located land that is zoned for similar uses and of adequate size to support a fast food restaurant * * * within the market area." (*Id*.) Sohm's computed price per square foot ranged from "$27.52 to $34.67," concluding "a price of $28 per square foot." Having selected at the low end of the range, the court finds that given the available evidence, Sohm's determination of the subject property's land real market value is reasonable.

To make a determination of real market value for the subject property's partially completed improvement, the court needs the total cost of work completed as of the date of assessment or cost factor data. Neither party provided the court with that information. The court lacks sufficient information to make a determination of the subject property's improvement real market value.

### III.  CONCLUSION

After careful consideration of the testimony and evidence, the court concludes Plaintiff failed to carry its burden of proof and insufficient evidence was presented for the court to make its own determination of the subject property's real market value as of the date of assessment. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of December 2011.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on December 14, 2011.  The Court filed and entered this document on December 14, 2011.*